**CHAMPLIN'S REALTY ASSOCIATES, L.P. et al.**

v.

**Marc TILLSON, in his capacity as Building Official of the Town of New Shoreham et al.**

No. 2001–491–Appeal.

Supreme Court of Rhode Island.

June 12, 2003.

Jeffrey H. Gladstone, Mark Jay Hagopian, Jon G. Hagopian, Michael J. Murray, Michael L. Rubin, James R. Lee, Brian A. Goldman, Providence, for Plaintiffs.

Lauren E. Jones, Providence, Donald J. Packer, Peace Dale, Andrew M. Teitz, David L. Krech; Nancy Giorgi, Johnston, R. Daniel Prentiss, Providence, for Defendants.

Present: WILLIAMS, C.J., FLANDERS, and FLAHERTY, JJ.

## O P I N I O N

WILLIAMS, Chief Justice.

The defendant, Town of New Shoreham (town, New Shoreham, or Block Island), appeals from a Superior Court judgment granting declaratory and injunctive relief in favor of the plaintiffs, Champlin's Realty Associates, L.P. (Champlin's), Viking Quest, Inc. (Viking Quest), Island Hi–Speed Ferry, LLC (Hi–Speed) and the Coastal Resources Management Council (CRMC) (collectively referred to as plain-

tiffs).[1] Specifically, the judgment declared that CRMC has exclusive jurisdiction over commercial ferry operations occurring in waters off Block Island and enjoined the town from enforcing a cease-and-desist order that prohibited Viking Quest and Hi–Speed from docking within those waters. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

This case arises from Block Island building official Marc Tillson's (Tillson), attempt to enjoin certain commercial docking activities occurring within the "New Harbor" section of the Great Salt Pond (pond).[2] The pond is a tidal water body on Block Island and connected to the Atlantic Ocean. Payne's New Harbor Dock (Payne's) and Champlin's own and operate docking facilities in New Harbor. The docks were scheduled to be used by two ferries as points of loading and unloading of passengers visiting the town. Viking Quest's ferry, the Montauk, used the Champlin's facility while Hi–Speed's ferry docked at Payne's.

In response to the Montauk's docking activities, Tillson notified Champlin's that the commercially zoned district encompassing its wharf did not permit ferry terminals. Thereafter, on October 18, 2000, the town issued a cease-and-desist

order prohibiting the Montauk from docking at Champlin's. That same month, Hi–Speed began ferrying passengers from the port of Galilee to Payne's. On February 26, 2001, the town issued a cease-and-desist order to Payne's notifying it that, by permitting Hi–Speed to dock at its wharf, it, too, was in violation of the town's zoning ordinance. The notices to Champlin's and Payne's alleged similar violations of the town's zoning ordinances.

Champlin's and Viking Quest filed the instant action in Superior Court seeking declaratory and injunctive relief to block the town's enforcement of its cease-and-desist order pertaining to Champlin's. Hi–Speed intervened as a plaintiff to enjoin the enforcement of the cease-and-desist order issued against Payne's. After a hearing, the Superior Court justice concluded that, by virtue of the docks' location below the mean high-water mark,[3] CRMC retained exclusive jurisdiction over the matter. The town timely appealed. The committee of the Great Salt Pond and the Block Island Residents Association filed amicus briefs supporting the town's position. The Attorney General of Rhode Island filed an amicus brief to support plaintiffs.

The town asserts that it has jurisdiction over the docking activities in this case by virtue of an 1887 legislative grant of own-

1. The Coastal Resources Management Council (CRMC) originally was a named defendant in the case. However, CRMC supports the position of Champlin's, Hi–Speed, and Viking Quest and thus, intervened as a plaintiff. Accordingly, we refer to CRMC as a plaintiff.

2. Amicus Block Island Residents Association provides the following description of New Harbor and the Great Salt Pond: "New Harbor is located on the southernmost shore of the [Great Salt] [p]ond. Once a fresh water pond closed to the Atlantic Ocean, the [Great Salt] [p]ond * * * can now be accessed from

Block Island Sound. * * * Access to New Harbor begins at the breachway * * *. To transverse the length of the [p]ond, a vessel enters a channel which begins at the breachway and stretches approximately one mile through the entire length of the [p]ond. * * * Docks in New Harbor * * * are confined to three locations—Champlin's Marina, the Block Island Boat Basin and Payne's Dock."

3. The mean high-water mark is the average height of all the high tides at a particular place measured over an 18.6 year period. *See State v. Ibbison*, 448 A.2d 728, 730 (R.I.1982).

ership of the pond from the state to the town. According to the town, in transferring ownership of the pond to the town, the state relinquished all rights to regulate within the pond and the town assumed exclusive jurisdiction. Alternatively, the town asserts that it has concurrent jurisdiction to prohibit the docking activities by virtue of its zoning authority over the land appurtenant to the docks.

## II

### Standard of Review

The only issue in this case is whether the town possesses jurisdiction over commercial ferry operations occurring in the pond. The answer to this question depends upon the interpretation of various statutes. This Court, as the ultimate arbiter of state law, conducts a *de novo* review of a trial justice's interpretation of a statute. *Town of Warren v. Thornton–Whitehouse*, 740 A.2d 1255, 1259 (R.I.1999). When interpreting a statute, our ultimate goal is to give effect to the Legislature's intention. *Id.* In doing so, this Court applies the well-established rule of construction that, when words in a statute are unambiguous, they must be given their plain, ordinary and usually accepted meaning. *Pier House Inn, Inc. v. 421 Corp.*, 812 A.2d 799, 804 (R.I.2002). Further, we presume that the Legislature intended to attach a significant meaning to every word, sentence, or provision of a statute. *Id.*

## III

### Exclusive Jurisdiction

The town contends that it is vested with exclusive authority to regulate ferry

operations occurring within the pond by virtue of an 1887 act. We disagree.

In 1887, the Legislature granted and ceded to the town, "[a]ll the right, title and interest of the state in and to the Great Salt Pond and the land covered thereby." 1887 R.I. Acts & Resolves ch. 617, § 1. The act authorized the town "to cause the breach formerly existing between the Great Salt Pond and the sea, or some other way or passage for the inflowing of water from the sea into said pond to be opened between said pond and the sea, and to keep and maintain such opening so made." *Id.* at § 2. If the town failed to open the pond to the sea or allowed the breach to "become and remain closed for a continuous period of one year, the grant and cession by the state * * * shall then immediately be annulled." *Id.* at § 4.

Because this act purports to grant rights in tidal lands [4] to the town, we must consider the legal effect of the grant in light of the public trust doctrine. *See Thornton–Whitehouse*, 740 A.2d at 1259. "Any system of regulation of tidal land in Rhode Island must be viewed in the context of [an] ancient and still vital doctrine[ ] of the law of this state, namely, the public-trust doctrine * * *." *Id.* The public trust doctrine dictates that "the state holds title to all land below the high-water mark in a proprietary capacity for the benefit of the public." *Greater Providence Chamber of Commerce v. State*, 657 A.2d 1038, 1041 (R.I.1995). "[T]he doctrine preserves the public rights of fishery, commerce, and navigation in these waters." *Id.* To fully understand the import of the doctrine as it relates to the 1887 transfer, it is helpful to trace the development of the public trust doctrine since it emerged in this country. Although our sister states have applied the public trust doctrine in

---

**4.** The term "tidal lands" refers to all lands lying seaward of the mean high-water mark.

*See Town of Warren v. Thornton–Whitehouse,* 740 A.2d 1255, 1259 (R.I.1999).

ways unique to their states, *Greater Providence*, 657 A.2d at 1042, the doctrine as a matter of American jurisprudence has an identifiable origin.

Since ancient times, the law has recognized the unique status of tidal lands through the public trust doctrine. The Greek philosophers set the foundation for the public trust doctrine, which first was codified in the second century Institutes and Journal of Gaius. *See* David C. Slade, *Putting the Public Trust Doctrine to Work*, ch. 1 at 4 (1990). This doctrine again was restated in the Institutes of the Justinian some four centuries later. *Id.* From there, the public trust doctrine was transplanted into the English common law after the Magna Carta, and eventually sailed to this country with the colonists. *See id.* at 5. In summarizing English common law, the United States Supreme Court stated:

> "In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or of arms of the sea, below ordinary high water mark, is in the King; * * * and that this title, *jus privatum,* '* * * is held subject to the public right, *jus publicum,* of navigation and fishing." *Shively v. Bowlby,* 152 U.S. 1, 13, 14 S.Ct. 548, 552, 38 L.Ed. 331, 336 (1894).

After the American Revolution, the original colonies, including Rhode Island, incorporated the public trust doctrine into their law and assumed ownership over tidal lands and the concurrent responsibility for managing them to benefit the public. *See* Slade, ch. 1 at 5. Like the King's title, the state's title over the pond before the

1887 transfer similarly was characterized by at least two separate, yet tightly interwoven interests: the *jus privatum* and the *jus publicum.* *See* Providence Steam–Engine Co. v. Providence and Stonington Steamship Co., 12 R.I. 348, 358 (1879) (Potter, J., concurring). The *jus privatum* relates to the state's title to tidal lands. *See Shively,* 152 U.S. at 13, 14 S.Ct. at 552, 38 L.Ed. at 336. That ownership interest, however, is subject to a public right or *jus publicum.* *See id.* These two characteristics form the basis of the public trust doctrine, which first was embodied in this state in the Rhode Island colonial charter and currently is codified in article 1, section 17, of the Rhode Island Constitution.[5] *See* Dennis W. Nixon, *Evolution of Public and Private Rights to Rhode Island's Shore,* 24 Suffolk U.L.Rev. 313, 320–21 (1990).

Justice Potter offered the following insightful description of the state's ownership over tidal lands.

> "It has been very common to speak of the right of the State in the shores as a fee. This is proper only by analogy. To hold that the State owns the shores in fee in the same sense in which it owns a court-house or a prison, or in which the United States own public lands, or a citizen may own land in fee, would lead to consequences which need only to be considered in order to show that such can never have been the nature of the right." *See Providence Steam–Engine Co.,* 12 R.I. at 358 (Potter, J., concurring) (citing Joseph K. Angell, *Angell on Tide Waters,* 24 (1826)).

**5.** Article 1, section 17, of the Rhode Island *Constitution provides in pertinent part:*
"The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, including but not limited to fishing from the shore, the gathering of seaweed, leaving the shore to swim in the sea and passage along the shore * * *."

The character of the state's title to tidal lands is "distinctive as compared to state-held title in other lands, * * * and different legal rules therefore apply." *State v. Central Vermont Railway, Inc.*, 153 Vt. 337, 571 A.2d 1128, 1130 (1989). The state may transfer its ownership of tidal land to another. *Thornton–Whitehouse*, 740 A.2d at 1259. Similarly, the state could grant municipalities the authority to regulate tidal lands on its behalf. *Id.* at 1259–60. However, a transfer of the property does not *ipso facto* include a relinquishment of the state's public trust responsibilities. *See Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387, 453, 13 S.Ct. 110, 118, 36 L.Ed. 1018, 1042 (1892) ("The trust devolving upon the State for the public * * * cannot be [simply] relinquished by a transfer of the property."). Rather, the intent to delegate regulatory power over tidal lands must be clearly expressed by the Legislature. *Thornton–Whitehouse*, 740 A.2d at 1260.

The 1887 act did grant title of the pond to the town. There is nothing in the act, however, that gives evidence of the state's intent to abdicate its public trust responsibilities and police power over the pond. *See Gwathmey v. State*, 342 N.C. 287, 464 S.E.2d 674, 684, 685 (1995) (holding that a statute granting title to "all the vacant and unappropriated [s]wamp lands in [the][s]tate" was insufficient to extinguish the public trust doctrine). Although the Legislature conveyed all of its "right, title and interest," that same language also was used by the Legislature in the two months subsequent to the pond's transfer to describe individuals' rights to convey property on dry land. Specifically, in separate resolutions, the Legislature provided that a particular sale of land "shall vest in the purchaser thereof all the right, title and interest" of the seller, 1887 R.I. Acts & Resolves res. 53, p. 323, and authorized a guardian to "convey all the right, title and interest" of certain minor children. *Id.*, res. 54, p. 323. This language contained in a grant of dry land would presumably operate to delegate regulatory authority. However, because "different legal rules * * * apply," *Central Vermont Railway, Inc.*, 571 A.2d at 1130, that language does not require the same result in this case.

In light of the Legislature's general use of this phrase, especially around the time of the pond transfer, we cannot interpret this language to be a clear expression of its intent to delegate regulatory power to the town. Further, the act specifies the extent of the town's authority pursuant to the act. Specifically, the town is "authorized and empowered to cause the breach formerly existing between [the pond] and the sea * * * to be opened * * *" and to appropriate money to achieve that goal. 1887 R.I. Acts & Resolves ch. 617, § § 2, 3. There is no similarly specific authorization for the town to regulate activities within the pond. Thus, it is apparent that the state ceded its ownership interest, the *jus privatum*, while retaining its responsibility and right to protect the public trust, the *jus publicum.* Therefore, the town's argument that it enjoys exclusive jurisdiction over the pond holds no water.

## IV

### Concurrent Jurisdiction

Having concluded that the state retains jurisdiction over the pond in spite of the 1887 statute, the question becomes whether the town exercises concurrent jurisdiction over commercial ferry operations conducted there. The town argues that it has the power to enjoin the use of the docks in this case as an indirect consequence of its power to regulate the dry land appurtenant to the dock through its zoning ordinances enacted pursuant to the

Rhode Island Zoning Enabling Act. *See* G.L.1956 chapter 24 of title 45.

In *Thornton–Whitehouse,* 740 A.2d at 1257, this Court considered the Town of Warren's asserted right to prohibit the construction of a residential dock in waters of the state. We rejected the Town of Warren's attempt and concluded that the state, through CRMC, enjoys exclusive jurisdiction over "residential, noncommercial boat wharves that are constructed on tidal land." *Id.* at 1262. Our conclusion that the town had no authority was based on the absence of a clear delegation to municipalities of a regulatory right over tidal lands in the Zoning Enabling Act or the Comprehensive Planning and Land Use Act. *See id.* at 1260.

The town attempts to distinguish this case from *Thornton–Whitehouse* because, here, it seeks to enjoin a particular *use,* rather than *construction,* of the dock. This Court, however, explicitly delineated the extent of a municipality's power over commercial ferry operations. Specifically, we noted that "if CRMC approves a wharf for a commercial ferry operation, the municipality can still exercise its zoning power to regulate construction of buildings, landscaping, lighting, and any other use of the upland." *Id.* The power to regulate upland areas in this manner falls well short of the power to veto a commercial ferry operation in its entirety. Contrary to the town's position expressed at oral argument, the absence of CRMC's specific approval for the ferry operations in this case does not grant New Shoreham any additional authority over commercial ferry operations. Indeed, no act of CRMC can alter a town's power to regulate in general. Thus, *Thornton–Whitehouse* clearly identifies CRMC as the only regulatory body for commercial ferry operations.

In a final attempt to keep its argument afloat, the town seizes upon dicta in *Thornton–Whitehouse,* 740 A.2d at 1260, in which we hypothesized that a town could enjoin certain commercial activities occurring on a residential dock by virtue of "its traditional zoning power to regulate the use to which land is put." From the town's perspective, the most relevant example we used in that case contemplated the following scenario: "If the [residential] land owner were to use the dock for commercial purposes, perhaps by selling bait to boaters on the river, the town could seek to enjoin that use under its zoning authority." *Id.* at 1260–61. This example, however, does not give the town authority to prohibit commercial ferries from docking within the pond in an area of the town that is otherwise zoned for commercial use.

The *Thornton–Whitehouse* bait salesman presumably could sell his wares in commercially zoned areas of the town either on the dock, in a parking lot or anywhere else in town that was zoned for commercial uses and thus, this use is more amenable to traditional zoning laws. Conversely, the commercial ferry operations at issue here have a much more direct connection to tidal waters. As the trial justice found, the ferries "in this case are simply docking * * * at their respective wharves," which were located in areas that already permitted commercial activities. Thus, these activities do not fall within the ambit of activities addressed by traditional zoning ordinances designed to regulate activities occurring on dry land.

Our acknowledgement that the town enjoys ownership rights over the pond by virtue of the 1887 act does not alter our conclusion. As discussed, ownership and regulatory rights are severable, and the 1887 act did not delegate regulatory rights. Further, since our decision in *Thornton–Whitehouse,* there have been no amendments to the Zoning Enabling Act or the Comprehensive Planning and Land Use

Act that lead us to the unmistakable conclusion that the Legislature has since delegated such authority.

## V

## Preemption

■ Even if we were to infer that the Legislature in 1887 had delegated to the town any power to regulate commercial ferry operations in the pond, it is clear that any such power has since been revoked and preempted.[6] In describing a state's right to revoke a municipality's authority over tidal lands, the United States Supreme Court stated: "In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes." *Illinois Central Railroad Co.*, 146 U.S. at 453–54, 13 S.Ct. at 118, 36 L.Ed. at 1043.

■ Pursuant to G.L.1956 § 46–23–6(2)(ii)(A), "[t]he [CRMC] shall have *exclusive jurisdiction* below mean high water for all development, operations, and dredging, consistent with the requirements of chapter 6.1 of this title and except as necessary for the department of environmental management to exercise its powers and duties and to fulfill its responsibilities * * *." By granting exclusive authority over such activities to CRMC, the General Assembly has expressed its intent to preempt municipal regulation of "development, operations, and dredging" occurring below the mean high-water mark. *Id.* Any municipal attempt to regulate these activi-

ties is preempted whether or not the "regulatory activity * * * [is] disruptive or otherwise inconsistent with the state's regulatory scheme." *Town of East Greenwich v. Narragansett Electric Co.*, 651 A.2d 725, 729 (R.I.1994).

Section 46–23–6(2)(ii)(A)'s exclusivity provision applies to "development, operations, and dredging" occurring below the mean high-water mark. The term "operations" is not specifically defined in the statute. However, that term is used in § 46–23–6(4)(iii) to describe CRMC's responsibility for a wide array of activities taking place below the mean high-water mark, including aquaculture, dredging, and "use of coastal resources which are held in trust by the state for all its citizens * * *." Based on the broad use of the term in that section, we conclude that the term "operations" as it is used in § 46–23–6(2)(ii)(A) has a significant and similarly broad meaning that encompasses commercial ferry activities.

According to the town, the exclusivity provision, which was enacted through P.L. 2001, ch. 163, applies only to dredging activities. Specifically, the town argues that, because ch. 163 focused on amendments to the state's authority over dredging activities, CRMC is not vested with exclusive jurisdiction over commercial ferry activities pursuant to § 46–23–6(4). That interpretation, however, runs afoul of our canon against interpreting a statute in a manner that renders particular words inoperative. *See Pier House Inn, Inc.*, 812 A.2d at 804. Before the amendments, § 46–23–6(2)(ii)(A) made specific reference to the terms "operations" and "develop-

---

**6.** In discussing preemption, we recognize that preemption was not a genuine issue in *Thornton–Whitehouse*, 740 A.2d at 1261, because "preemption only exists in circumstances in which the municipality would have the authority to regulate a particular subject in the absence of state action." Although Block Island has no authority to regulate the commercial ferry operations in this case, we discuss preemption in light of the express preemption clause added to CRMC's enabling legislation in 2001. *See* P.L.2001, ch. 163, § 6.

ment" but did not mention dredging. Before it was amended to its current form, § 46–23–6(2)(ii)(A) merely required "[a]ny person, firm, or governmental agency proposing any development or operation within, above, or beneath the tidal water below the mean high water mark * * * to demonstrate that its proposal would" meet certain criteria. Thus, it is clear that the Legislature attributed specific meanings to the terms "development" and "operations" independent of the term "dredging."

We conclude that those terms retain their independent significance after the amendatory process. If the Legislature intended to limit CRMC's exclusive jurisdiction only to dredging activities, it would not have included the terms "development" and "operations" in connection with CRMC's exclusive jurisdiction. Accordingly, any municipal attempt to prohibit commercial ferries from docking at a particular location is an invasion of CRMC's exclusive jurisdiction over "development, operation, and dredging" activities and is preempted. Section 46–23–6(2)(ii)(A).

This exclusive jurisdiction vested in CRMC through § 46–23–6(2)(ii)(A) must, however, be considered in light of other explicit grants of authority to municipalities. For example, in G.L.1956 chapter 4 of title 46, the Legislature expressly delegated to municipalities certain powers relating to harbors within their boundaries. To the extent that these statutory provisions conflict, we will make every attempt to read them harmoniously. *See Local 400, International Federation of Technical and Professional Engineers v. Rhode Island State Labor Relations Board,* 747 A.2d 1002, 1004 (R.I.2000). To read chapter 4 of title 46 and other similar provisions harmoniously with § 46–23–6(2)(ii)(A), we hold that CRMC's exclusive jurisdiction may yield to an express dele-

gation of authority to a municipality or other government agency. Because the town has not expressly been delegated any authority to prohibit commercial ferries from docking within the pond, CRMC retains exclusive jurisdiction over such activities.

## VI

### CRMC Assent

Finally, the town asks this Court to vacate the portion of the Superior Court order declaring that "the loading and docking of a commercial ferry at marinas and docks on the [pond] * * * including Champlin's and Payne['s] Dock, are proper and allowable uses of the [p]ond's Type 3 water designation as defined by the regulations of the [CRMC]." Apparently, the town is concerned that the order deeming the ferry activities in this case "proper and allowable uses" of the pond permits the inference that CRMC "assents" to plaintiffs' activities in this case.

The CRMC categorizes the pond as a "Type 3" water body. According to CRMC regulations, Type 3 waters include "intensely utilized water areas where recreational boating activities dominate and where the adjacent shorelines are developed as marinas, boatyards, and associated water-enhanced and water-dependent businesses." Coastal Resources Management Plan (CRMP) § 200.3. As CRMC executive director, Grover Fugate, testified at a separate hearing before the Division of Public Utilities and Carriers, CRMC assent to undertake such operations within Type 3 waters may be required depending on their intensity and interference with recreational boating activities. *See* CRMP § 100.1 (requiring CRMC assent for certain activities occurring within tidal waters). The town argues that the ruling was premature because there was no evi-

dence that CRMC ever had determined whether its assent would be required, and if so, whether it would be granted.

The parties here do not dispute the pond's Type 3 designation. Nor do the parties dispute that such waters *may* be used for commercial ferry operations. As discussed, however, the issue in this case concerns only the town's regulatory authority over the pond. The plaintiffs had never applied for CRMC assent, nor did CRMC stipulate that such assent would be unnecessary. Further, the town did not seek to enjoin the plaintiffs' activities for lack of CRMC assent. In describing CRMC's position on the relationship between commercial ferry operations and Type 3 waters, the hearing justice said that such activities would be permitted, "*according to CRMC,* as long as the use does not significantly interfere or preclude recreational boating." (Emphasis added.) Thus, it is clear that the court order merely described the legality of undertaking commercial ferry activities within the pond pursuant to CRMC's definition of Type 3 waters. The order did not address the issue of CRMC's assent to the plaintiffs' activities in this case and, accordingly, we need not disturb that portion of the order.

### Conclusion

For the foregoing reasons, the town's appeal is denied and dismissed. The judgment of the Superior Court is affirmed. The papers of the case may be remanded to the Superior Court.

Justice GOLDBERG did not participate.