[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
The plaintiffs, a number of property owners and residents of the Town of Warren, Rhode Island, petition this Court to reverse the decision of the Zoning Board of the Town of Warren sitting as the Subdivision Board of Review of the Town of Warren ("Board of Review"). The Board of Review reversed the Warren Planning Board ("Planning Board") and approved Defendant GRF Associates' ("GRF" or "applicant") preliminary subdivision plan. The plaintiffs herein seek reversal of the Board of Review's decision. Jurisdiction is pursuant to G.L. 1956 § 45-23-71.
 FACTS AND TRAVEL
The Rhode Island Land Development and Subdivision Review Act of 1992, §§ 45-23-26 to 45-23-74, sets forth the procedure to be followed in applying for approval of a subdivision. Because GRF seeks to divide its property into more than five individual lots, the project qualifies as a "major subdivision" under the terms of the Act; approval requires satisfying several steps. Section 45-23-32(22). The applicant must first obtain planning board approval of a master plan. Section 45-23-40(d)-(e). If the master plan is approved, the applicant may then submit a preliminary plan, for which a public informational meeting must be held before the planning board may approve or deny it. Section 45-23-41(f). If the preliminary plan is approved, the applicant may proceed to the final plan stage.
GRF first began the major subdivision approval process for its Touisset Farms development in 1996. The applicant proposed to build a twenty-two residence[1] subdivision in the Touisset neighborhood of Warren on a 24.6 acre parcel of real property. See In re Touisset Farms at 2 (Town of Warren Zoning Board of Review sitting as the Subdivison Board of Review) [hereinafter Zoning Bd. Dec.] Because the site of the proposed development includes some small wetland and protected areas, GRF was also required to obtain the approval of its plans from the Rhode Island Department of Environmental Management ("DEM") and the Rhode Island Coastal Resources Management Council ("CRMC"). Id. at 3. After investigation and a public hearing, the CRMC granted an Assent, finding that the subdivision would not have a significant negative impact on the environment. In re Touisset Farms, No. 99-1-38 at ¶ 22 (CRMC Jan. 24, 2000) [hereinafter CRMC Dec.] The CRMC found the applicant's "soil erosion, [sediment] control and stormwater management report" acceptable and up to standard, and found the individual sewage disposal systems (ISDS) proposed were acceptable. (CRMC Dec. ¶ 6, 9, 12.) The CRMC concluded that those neighboring residents who had had problems with their wells drew their water from a separate hydrological regime not related to the area affected by the proposed subdivision. Id. at ¶ 16, 18. The CRMC concluded that there would be no adverse impact on the wetlands, the coastal environment or the aquifer and that the applicant had taken "all reasonable steps" to minimize impacts. Id. at 20, 22. The DEM also approved the applicant's plans.
 Reports of the Town's Independent Engineering Consultants
In July of 1996, the Town of Warren hired Siegmund and Associates ("Siegmund") to undertake an evaluation of GRF's proposed development on its behalf. Siegmund concluded that the expected water use of the new subdivision would not have a significant effect on water supply capacity in the area. (Letter from Laszlo Siegmund, P.E. to Jane McDougal of the Warren Planning Commission, dated 7/12/96 at 1). Regarding storm water management, Siegmund concluded that there would be a "zero net increase in storm water runoff" comparing post-development to pre-development conditions. (Letter from Laszlo Siegmund, P.E. to Jane McDougal, dated 10/30/96 at 1.) Referring to a survey of nearby property owners, Siegmund noted that only five of the twenty-six owners had had problems with their well water supply in the past, and the causes of these problems could not be ascertained. (Letter from Laszlo Siegmund, P.E. to Jane McDougal, dated 10/30/96 at 1.) Siegmund concluded that the problems did not follow any pattern; for example, one well had had problems the previous summer, while another that was thirty-five feet away had none. Id. at 2. In the meantime, three test wells had been installed and pumped on the subject property, and had yielded between three and eighteen gallons per minute, which Siegmund considered satisfactory for single family homes. The engineers "[could] not conclude that there is a general shortage of water in the area." Id.
The Town of Warren also hired James J. Geremia Associates, Inc. ("Geremia") to review GRF's proposal.[2] (Letter from James J. Geremia, P.E. to William Hanley, Building Official of 6/16/00 at 1.) Geremia concluded that the plans for the proposed subdivision met the Town's requirements for roadway construction, drainage, individual sewage disposals systems, and water supply. Id. at 1. Specifically, Geremia found that the ISDS systems proposed by GRF would reduce biological oxygen demand, total suspended solids, fecal coliform and total nitrogen compared to standard systems. Id. at 1-2. In addition, Geremia concluded that the drainage plans, soil erosion, sediment control, and storm water management report indicated that erosion and sediment migration would be minimized, and that the increased traffic volume generated by the development would not decrease the level of service on nearby roads. Id.
at 2. Finally, GZA GeoEnvironmental, Inc. ("GZA"), with which Geremia contracted to analyze the impact of the subdivision on neighbors' wells, reported that normal and routine pumping of the wells would not cause significant drawdowns or result in the migration of seawater to existing wells. Id.
 Testimony at the Public Hearings
Public hearings before the Planning Board on the applicant's preliminary plan were held on November 20, 2000, December 4, 2000 and January 29, 2001. Issues addressed included traffic, storm water and erosion management, wastewater disposal and water supply.
At the January 29, 2002 public hearing, Anthony J. Winiarski, a civil engineer with Commonwealth Engineers Consultants, Inc. ("Commonwealth"), testified for GRF. (Tr. 1/29/01 at 5.) Winiarksi testified that Commonwealth had done a traffic study which indicated that there would be no significant difference in traffic delays between the year 2000 and 2010 — less than two tenths of a second — if the development were built. Id. at 7-8, 11, 16. The negligible increase in traffic, Winiarksi testified, would not contribute in any significant way to the degradation of the pavement. Id. at 18-19. Winiarksi made several recommendations, including that part of a wall be removed, some brush be cut back, and trees trimmed, and that if driveways exit onto Touisset Road, they provide turnarounds so that vehicles exiting the driveways would not have to back into the road. Id. at 14.
The plaintiffs presented the testimony of Martha Heald ("Heald"), a local resident and apparently a plaintiff in the present suit, to testify regarding traffic;[3] she was accepted by the Planning Board as an expert witness on the basis of her nineteen years experience as a civil engineer. (Tr. 1/29/01 at 106, 144.) She was concerned that the road was too narrow to be safe, and also that visibility from the driveways exiting onto Touisset Road was insufficient. Id. at 117-24. She testified, however, that she did not analyze anything that the applicant had actually proposed building.[4] Id. at 127-28. Several other local residents also voiced their concerns about potential traffic impacts.See generally id. at 134-73.
At the November 20, 2001 public hearing, Christopher Duhamel of DiPrete Engineering Associates, the company that designed the planned drainage system for the development, testified on behalf of GFR to explain the drainage system design. (Tr. 11/20/00 at 3.) The plan, he stated, conformed to the DEM's "best management practices." Id. He noted that the property, being agricultural, presently has no existing runoff control and thus a high potential for erosion; the property is sloped such that sediment and silt run off the property into the wetlands. Id. The plan proposed by GRF would provide catch basins to intercept runoff and route it to a detention pond where it would allow for infiltration and feed into the groundwater supply. Id. Duhamel testified that the system GRF was proposing would actually benefit the Audubon Society's land by filtering silt out of the water that does flow into the wetlands. Id.
Heald testified as an expert witness for the plaintiffs on this issue, as well. (Tr. 1/29/01 at 106, 144.) She stated that the storm management plans submitted by GRF did not meet with the requirements of the Rhode Island Storm Water Instillation and Design Manual[5] because one of the swales that would be used to filter runoff is within one hundred feet of the proposed location of one of the ISDS systems. Id. at 107-08. Heald was also concerned that storm water discharge could cause flooding problems downstream in the wetlands.[6] Id. at 111.
On the issue of septic systems, Duhamel testified that percolation tests had been performed on the subject property and the DEM had approved the use of conventional systems. Id. at 13. However, GRF has proposed to use a more technologically advanced septic system that would increase denitrification when compared to standard systems. Id. at 16. Because it would put less of a burden on the soil, the viability of the systems would be lengthened. Id. at 18. These advanced systems would have an additional advantage, Duhamel stated, in that they would not require any regrading because they do not need to be raised. Id. Duhamel testified that in his professional opinion, to a reasonable degree of certainty, the ISDS systems of the proposed development would have no adverse effect on the environment. Id. at 22.
Alex Rothschild, a hydrologist with the firm of Levine Fricke Recon, testified as an expert for GRF regarding the impact the development would have on groundwater in the area. (Tr. 11/20/00 at 116.) His firm performed a geohydrolic assessment of the subject property, going, he testified, well beyond what is customary for a project of this type. Id.
at 120. Rothchild stated that his firm surveyed and mapped the groundwater elevation contours and performed a water budget analysis that indicated that the amount of water that would be available for infiltration into the ground would be greater post development than predevelopment, meaning that the water supply might actually increase due to improvements to runoff and erosion management. Id. at 121-24. In addition, the firm drilled three test wells at different locations on the applicant's property. Id. at 126-27. According to Rothchild, the test wells yielded between three and eighteen gallons per minute, "well within the boundaries of the state regulations relating to what wells should yield." Id. at 127-28.
Based on these tests, Rothchild concluded that the installation of new wells for the development would not cause neighbors' wells to dry or suffer saltwater infiltration. Id. at 133. Rothchild testified that GZA, using a completely different methodology, reached the same conclusions that his firm had. Id. at 143. Addressing the fact that nearby property owners had had problems with their wells in the past, Rothchild observed that these problems were individual, not regional issues. (Tr. 11/20/00 at 149-50; 1/29/01 at 54-55.) He noted that the problems these individuals had could stem from a number of factors: these owners' lots are quite small, many of the wells are quite old, and some owners share wells. Id.
The issue of lawn watering and its effect on the water supply was also vigorously debated. GZA recommended that to protect the water supply, lawn watering should be limited to less than one inch of water per week. (Tr. 11/20/00 at 144.) Rothchild testified that even this amount, which would require fifty hours of watering a week, was unrealistic. Id. at 144. John Carter, a landscape architect, explained that grass requires about an inch of water in order for the watering depth to reach four to six inches below the surface, the depth necessary to maintain the grass. (Tr. 1/29/01 at 68.) He noted that in this region, watering a lawn to this depth might only be required once or twice a season. Id. at 69. He further testified that water use could be reduced by prohibiting automatic sprinkler systems, requiring lawns to be planted with drought-tolerant grass seed restricting homeowners to watering on either even or odd numbered days.[7] Id. at 70-74. Finally, he testified that of the 24.6 acres comprising the subject site, only 8.6 acres, or thirty-five percent, would be capable of being watered in any event. Id.
at 73.
Rothchild summarized his conclusions by stating "[i]t's my professional opinion that the development of this project . . . will have no significant adverse impact on any of the existing nearby wells, it will not diminish the amount of water which is available to them, and the fact that it will likely increase through improving the amount of water available for infiltration. It will not cause a salt water intrusion at the site or in the area, and it will not cause a nitrogen loading issue into the area." Id. at 149. He asserted that he was "very certain" of his conclusions. (Tr. 12/4/00 at 47.) Rothchild further testified that GRF was willing to condition building each home on testing each well as it had been drilled to make sure that they have adequate yield and quality and ascertain any impact on other wells.[8] (Tr. 1/29/01 at 51-52.)
Dr. Janet Baldwin, Ph.D. ("Baldwin"), a local resident and professor of environmental engineering, testified on the plaintiffs' behalf on the water supply issue. (Tr. 12/4/00 at 56.) She was accepted by the Planning Board as an expert witness in hydrogeology. Id. at 58. Baldwin testified that she examined the work done by the Town's engineers and that she found "significant errors or omissions or alternative ways you could look at those analyses." Id. at 63. First, she testified that when the water budget relied on by GZA and Rothchild was calculated, lawn watering was not factored into the equation. Id. at 66. She also testified that she did not believe that groundwater flow did not travel in the direction that Rothchild testified that it did. Id. at 77-82. Baldwin further expressed concern that as water is used, the danger of saltwater infiltration will increase. Id. at 83-84. She conceded, however, that she had not done any analysis of the direction flow of the groundwater herself. Id. at 91. In addition to testimony presented by the parties, a number of local residents stated their opposition to the development on grounds that it was inconsistent with the Town's Comprehensive Plan as it would allow for development of open land and might adversely affect their water supply. Id. at 132-73. After reviewing and hearing the above evidence, the Planning Board voted to deny the preliminary plan on October 17, 2001. On September 25, 2002, the Board of Review reversed the Planning Board.
 STANDARD OF REVIEW
The Development Review Act prescribes the applicable standards of review. Prior to review by this Court, the Board of Review is authorized to reverse the Planning Board only if it finds the Planning Board's decision erroneous due to "prejudicial procedural error, clear error, or a lack of support by the weight of the evidence in the record." Section45-23-70(a). In reviewing the Board of Review's decision, this Court utilizes, "the `traditional judicial review' standard that is applied in administrative-agency actions." Restivo v. Lynch, 707 A.2d 663, 665
(R.I. 1998) (citing E. Grossman Sons, Inc. v. Rocha, 118 R.I. 276,284-85, 373 A.2d 496, 501 (1977)). Therefore, the Court must not consider witness credibility, weigh the evidence, or make findings of fact. Munroev. Town of E. Greenwich, 733 A.2d 703, 705 (R.I. 1999) (citing Kirby v.Planning Bd. of Review of Middletown, 634 A.2d 285, 290 (R.I. 1993)). The standard of review is provided by statute:
 "The court shall not substitute its judgment for that of the planning board as to the weight of the evidence on questions of fact. The court may affirm the decision of the board of appeal or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory, ordinance or planning board regulations provisions;
 (2) In excess of the authority granted to the planning board by statute or ordinance;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 46-23-71(c).
The Court's review is thus confined to a search of the record to ascertain whether the Board of Review's decision "rests upon competent evidence or is affected by an error of law." Munroe, 733 A.2d at 705
(citing Kirby, 634 A.2d at 290). Only if the record is "completely bereft of competent evidentiary support" may a board of appeal's decision be reversed. Sartor v. Coastal Resources Mgmt. Council, 542 A.2d 1077, 1083
(R.I. 1988).
 THE ZONING BOARD DECISION
In the present case, the Board of Review reversed the Planning Board because it found the latter's decision to be both against the overwhelming weight of the evidence and a clearly erroneous application of the applicable standards.[9] The plaintiffs assert that the Board of Review exceeded its authority in reversing the Planning Board's decision because it substituted its own judgment for that of the Planning Board and engaged in weighing the evidence. GRF denies that the Board of Review made such an error, contending that the Board of Review correctly concluded that the Planning Board's decision was not supported by the weight of the evidence.
In challenging the Board of Review's reversal, the plaintiffs assert that the Board of Review exceeded its authority because it impermissibly substituted its own judgment for that of the Planning Board and therefore applied an incorrect standard of review. Instead, they assert, the Board of Review should have examined the record to determine whether there was "not more than a scintilla of evidence in support of the Planning Board decision." Id. The plaintiffs argue that because the Planning Board's decision was based on legally competent evidence, the Board of Review was clearly erroneous in overturning it.
The plaintiffs misconstrue the statutory standard of review. Section45-23-70(a) allows the Board of Review to reverse due to lack of support by the weight of the evidence. The Court's function in construing a statute is "to give effect to the General Assembly's intent." Ret. Bd. ofthe Employees' Ret. Sys. of Rhode Island v. DiPrete, 845 A.2d 270, 279
(R.I. 2004) (citing Champlin's Realty Assocs., L.P. v. Tillson,823 A.2d 1162, 1165 (R.I. 2003)). The Court must presume that "the General Assembly intended to attach significance to every word, sentence and provision of a statute." Ret. Bd. of the Employees' Ret. Sys. ofRhode Island, 845 A.2d at 270. When a statute is clear and unambiguous, "there is no room for statutory construction, and the statute will be literally applied, attributing the plain and ordinary meaning to its words." Id. (citing Interstate Nav. Co. v. Div. of Public Utilities andCarriers, 824 A.2d 1282, 1287 (R.I. 2003)). It is clearly necessary that the Board of Review participate, to some extent, in weighing the evidence if it is to determine whether the Planning Board's decision is against the weight of the evidence, although the Board of Review does not utilize the de novo standard.
The General Assembly has prescribed a number of factors that a planning board must consider in reviewing a preliminary plan. Before approving a plan, the planning board must make positive findings on the record relating to the following provisions:
 "(1) The proposed development is consistent with the comprehensive community plan and/or has satisfactorily addressed the issues where there may be inconsistencies;
 (2) The proposed development is in compliance with the standards and provisions of the municipality's zoning ordinance;
 (3) There will be no significant negative environmental impacts from the proposed development as shown on the final plan, with all required conditions for approval;
 (4) The subdivision, as proposed, will not result in the creation of individual lots with any physical constraints to development that building on those lots according to pertinent regulations and building standards would be impracticable. (See definition of Buildable Lot). Lots with physical constraints to development may be created only if identified as permanent open space or permanently reserved for a public purpose on the approved, recorded plans; and
 (5) All proposed land developments and all subdivision lots have adequate and permanent physical access to a public street. Lot frontage on a public street without physical access shall not be considered in compliance with this requirement." Section 45-23-60.
A planning board's findings of fact must be supported by legally competent evidence that is on the record and discloses "the nature and character of the observations upon which the fact finders acted." Section 45-23-60.
 Compliance with the Zoning Ordinance andConsistency with the Comprehensive Plan
The Planning Board did not make positive findings on the first two factors: consistency with the town's comprehensive plan, and compliance with the local zoning ordinance. Although the Planning Board did not actually find that the proposed subdivision would violate the Town's zoning ordinance, it did express concern that a cul-de-sac in the development would be more than 600 feet long, which is against the Planning Board's rules.In re Touisset Farms Development at 5 (Town of Warren Planning Bd. Oct. 17, 2001) [hereinafter Planning Bd. Dec.]
With respect to the proposed subdivision, the Zoning Board found that each of the lots in the subdivision would be greater than one acre, conforming to zoning requirements for an R-40 zoning. In addition, the Board of Review highlighted that the uncontroverted evidence indicated that no waivers or variances would be needed. The Board of Review also noted that no building is planned within any setback areas and that the wetland areas are adequately buffered according to state regulations. Moreover, the Board of Review found that the cul-de-sac causing concern had been established at the Master Plan level as having fewer impacts than a second road, an alternative to which the Planning Board had objected. See Zoning Bd. Dec. at 12.
With respect to the second factor of § 45-23-60, the Planning Board did find that the proposed development would be inconsistent with the Comprehensive Community Plan of the Town of Warren ("Comprehensive Plan") and that the inconsistencies had not been satisfactorily addressed. Planning Bd. Dec. at 2. Specifically, the Planning Board found that the proposed development was inconsistent with the Comprehensive Plan's stated policy of "ensur[ing] that any new housing development is provided with adequate fire, water, sewage, education, and other town services, and that service increases and extensions are affordable." Id. The Planning Board further found that the subdivision would be inconsistent with other goals and policies of the Comprehensive plan in that the subdivision would destabilize existing neighborhoods. Id. In addition, it found that no one could predict the effect the development would have on the maintenance of local roads. Id. The Planning Board also found that the development was inconsistent with the Comprehensive Plan because it would not retain traditional land patterns, would develop too much farm land, would not reduce urban sprawl, and would not encourage continued agricultural use of farmland.[10]Id. at 2-3. Further, the Planning Board found that, contrary to the policies of the Comprehensive Plan, no open land was being provided for recreation except a pond, which could only be used for skating, and noted that the land left undeveloped was unbuildable anyway.Id. at 4. Finally, the Planning Board concluded that the subdivision proposal had not adequately addressed these. Id.
In reviewing the Planning Board's decision, the Board of Review found that these findings and "conclusory remarks regarding aspects of the Comprehensive Plan" were against the weight of the evidence in the record.See Zoning Bd. Dec. at 1-3, 12. Reviewing the record, the Board of Review noted that the subdivision, as proposed, would be consistent with specific provisions of the Comprehensive Plan. Id. at 2. In particular, the development would conform to the R-40 zoning of the parcel. Id. The Board of Review noted that this designation has been declared by the Warren Town Council to be consistent with the Town's Comprehensive Plan.[11]Id. at 2-3. Finally, the Board of Review noted that the weight of the evidence, and specifically, the undisputed conclusion of the Town's own engineer, supported the conclusion that the plans met the Towns' requirements as they relate to roadway construction, drainage, individual sewage disposal systems and water supply."Id.
Furthermore, the Planning Board's statements that the applicant's property should be reserved for agricultural use in order to be consistent with the Comprehensive Plan lack substantive support in the record. The Town Council zoned the parcel for residential use and found such a designation to be consistent with the Comprehensive Plan.[12] As this was a legislative act, it is presumed valid. Ruby Assoc. v. Ferranti,603 A.2d 331, 333 R.I. 1992). As to elements of the Comprehensive Plan other than land use, the record evidence demonstrates that recreational land is being provided, services will be adequate, and that wetlands, coastal features and buffers are being protected. The Board of Review's conclusions that the weight of the evidence did not support the Planning Boards findings regarding compliance with the zoning ordinance and Comprehensive Plan are supported by reliable, probative and substantial evidence in the record.
 The Environmental Impacts of the ProposedDevelopment
The most contentious aspect of the GRF's proposed subdivision is its potential impact on the local environment. Section 45-23-60 requires a finding that there will be no significant negative environmental impacts from the proposed development as shown on the final plan, with all required conditions for approval. On this element, the Planning Board expressed concern about the installation of wells and septic systems to service the new houses. It stated:
 "The major unresolved concern since the inception of this project has been water, both the supply and the discharge. . . . It is a well-known fact that the abutters have had problems with their wells at least on occasion, and they are rightfully concerned. Will 18 additional houses drawing from a common aquifer contribute to a more severe water shortage problem then [sic] now exists? Everyone agrees that it won't increase the water supply to exiting abutters. Could the development decrease the supply of water to the abutters? It could happen, and the developers stated, and we quote, "there are no guarantees." The developer's hydrologist stated that the bedrock is very permeable to the point that water pumped from the aquifer and discharged into the thin layer of soil above the bedrock would recharge the aquifer. Therefore, virtually no water loss. But will it? Just how permeable is the bedrock?" Id. at 5-6.
Relying on personal observations of one of its members and a report of one of the town's engineers that stated that the soil had low hydraulic conductivity and that wells would yield small but generally reliable amounts of water, the Planning Board concluded that a negative impact would result. Specifically, the Planning Board found that "due to the very wet soils east of the wetlands, and the apparent reluctance of the surface water to permeate the bedrock, and the likely increase of waterflow down and through the hill due to the substantial increases of above bedrock water discharged by the 16 residences," the subdivision would have a detrimental effect on neighboring properties. Id. at 6-7.
The Board of Review found that the weight of the evidence in the record did not support this finding on the environmental impacts of the development, characterizing the finding as lay speculation. It noted that the preliminary plan complied with all environmental setbacks and buffers. Zoning Bd. Dec. at 3. Further, the Board of Review noted that the CRMC had, after a thorough review, approved the development, finding that there would be no adverse impact on the wetlands complex adjacent to the site, that the storm water drainage would meet all applicable standards, and that the ISDS systems were designed based on advanced technology. Id. The Board of Review acknowledged the statements of lay witnesses at the public hearings that some areas of the site are occasionally wet, but found that such comments did not take into account the new drainage system and its expected effectiveness. Id. The Board of Review noted that the only evidence in the record relating to drainage post-development indicated that there would be no negative impacts. Further, the Board of Review pointed out that Duhamel had testified that in his professional opinion, the drainage and water quality in the area would improve, a conclusion corroborated by the two engineering firms hired by the Town. Id. at 4-5.
Regarding the effects of the septic systems on the environment, the Board of Review found that the Planning Board's negative finding on the environmental impact issue was against the weight of the evidence. It noted that the DEM approved the design of the ISDSs and determined that the effect on the wetland of the subdivision would be insignificant. Id. at 5. It further noted that the three independent opinions the Town received from its own consultants — Siegmund, Geremia, and GZA — all indicated that the use of the improved ISDS systems would reduce any possible impacts, reduce nitrogen loading, and generally exceed the DEM's standards. Id. at 6.
Regarding the area's water supply, the Board of Review carefully noted:
 "The issue is one that involves complex hydrological and geological analysis. And while the opinions of expert witnesses are not all required to be believed, there does come a point at which lay speculation can be overwhelmed by unanimous informed technical analysis by experts (including independent experts) in a complex field, and this is what we believe the weight of the evidence in the record reveals with respect to the water supply. While the Planning Board and the objectors were looking for `guarantees' and `beyond a reasonable doubt' satisfaction on this issue, we do not believe that the applicants were required to attain so strict a standard of proof, and we believed that they proved based on reasonable probabilities that this development will not cause negative environmental impacts in terms of water supply, or potential salt water intrusion into other wells in the area.
 The evidence on this issue included a survey of area residents which revealed that some of them had experienced problems with the wells in recent years during dry periods. However, there was no clear pattern or cause with respect to the `problem' wells. Some were located right next to properties which had no problems at all. In view of the large number of old substandard preexisting lots in the area and the various depths and qualities of then old wells, the survey results were not particularly illuminating.
 At this time there are no local restrictions on building new wells in any part of the Touisset area. The overwhelming weight of the evidence in the record was that the construction of new wells on the particular 24.6 acre site in the manner proposed would have no adverse impact on the overall water supply in the area.
 Alex Rothchild, a qualified hydrologist with extensive experience involving such issues, provided extensive testimony to this effect following several years of testing on the specific site in question. . . .
 [His] opinions were unanimously corroborated by the Town's own independent engineering firms. . . .
 More recently, the GZA firm was asked by the Town to review all the data and Rothchild's work was to provide an independent opinion. The opinion was authored by Michael Powers. The record reveals that Powers is a highly respected hydrologist in the region and was formerly involved in such activities as an official of the DEM. Interestingly, Powers used a different method of scientific analysis than Rothchild, but came to the same conclusion that this small subdivision would not cause well problems. . . .
 Geremia Associates, another engineering firm hired by the Town, also endorsed the opinion rendered by GZA. (They in fact referred the Town to GZA for another opinion on this [sic] issues).
 Finally, in its Assent for the project, the CRMC also made specific findings (Para. 16) rejecting the objectors [sic] position that this subdivision would create water problems. The CRMC also found (Para. 20) that the subdivision would have no adverse impact on the aquifer." Id. at 7-10 (emphasis in original).
With respect to the above, the plaintiffs argue that the Zoning Board's decision is erroneous because the Planning Board properly relied on expert testimony, lay observations, and the Planning Board members' own expertise and experience in making its decision. They cite Smith v.Zoning Bd. of Rev. of the City of Warwick, 103 R.I. 328, 334-35,237 A.2d 551, 555 (R.I. 1968) to support their position that the Planning Board properly used conflicting lay evidence and their own expertise to deny the preliminary plan application.
The plaintiffs' reliance on Smith is misplaced. In Smith, although the Rhode Island Supreme Court held that a zoning board might rely on its own knowledge in considering whether to grant a special use permit, it also held that lay testimony relating to issues properly within the province of expert witnesses carried no probative force. Id. at 333, 554 (citingThomson Methodist Church v. Zoning Bd. of Rev., 99 R.I. 675, 682,210 A.2d 128, 142 (1965); Goldstein v. Zoning Bd. of Rev., 101 R.I. 729,732, 227 A.2d 195, 198(1967)); see also Salve Regina College v. Bd. ofRev. the City of Newport, 594 A.2d 878, 881 (R.I. 1991). Furthermore, while a planning board may be presumed to have "a special knowledge of matters that are peculiarly related to the administration of a zoning ordinance and of local conditions as they are affected by the provisions of a zoning ordinance," board members are not presumed to "be qualified as experts in any trade, occupation or profession even though these may relate to the use of land." Bonitati Bros. v. Zoning Bd. of Review,99 R.I. 49, 55, 205 A.2d 363, 366 (1964) (quoting Kelly v. Board ofReview of Review, 94 R.I. 298, 180 A.2d 319, 322 (1962)). Thus, the Planning Board's own analysis of the data presented by the applicant, by which it arrived at different conclusions from all of the qualified experts, is not probative evidence.
Here, GRF presented evidence, in the form of testimony and reports from its own engineers and those hired by the Town, all demonstrating that the proposed subdivision would have no adverse effect on the adequacy of the water supply. The only conflicting testimony was from Heald, a neighbor opposing the development, who had done no independent analysis. In SalveRegina College, the Supreme Court found that a zoning board of review had abused its discretion in recognizing a neighboring objector as an expert where the testimony of the purported expert was not formed on an impartial and professional perspective, but from the perspective of a neighboring property owner who was opposed to the proposal under review.Salve Regina College, 594 A.2d at 881. Accordingly, here, like the Supreme Court in Salve Regina College, the Board of Review may have accorded the expert's opinion less weight than the lower body did because of these indications of possible bias.
Finally, in arguing for reversal of the Board of Review's decision, the plaintiffs argue that it was logically flawed because the Board of Review "relied on supposition to refute direct observation." The plaintiffs citeRestivo v. Lynch for the proposition that testimony is competent when it regards "observed effects and physical facts," and claim that the objector's lay testimony consisted of observed facts. This argument is without merit. The testimony cited by the plaintiffs did not relate to facts, but instead to the unsubstantiated concerns of the plaintiffs.[13]
In contrast, the lay testimony in Restivo consisted of objectors' statements that they had observed the property to be developed, and that it did not drain well.¹ Restivo, 707 A.2d at 671. It is quite clear that the objectors have not directly observed the effects of this yet-to-be-built subdivision. It is equally clear that the Planning Board erroneously relied on lay opinions on matters properly addressed by experts. See Salve Regina College, 594 A.2d at 882. Accordingly, the Board of Review's conclusion that the Planning Board's findings were "contrary to the overwhelming weight of evidence in the record, and they essentially ignore that evidence in favor of lay conjecture and speculation" is not clearly erroneous. Id. at 11.
 Creation of Lots with Physical Constraints to Developments and Adequate Access to a Public Street
Referring to the final two provisions of § 45-23-60, relating to the creation of lots with physical constraints to developments and adequate access to a public street, the Planning Board expressed two concerns. The first was that there might be a drainage line that was not indicated on the plans that might make one of the lots unsuitable for development.[14]Id. at 8. The other concerns were that traffic along Touisset Road might some day increase to the point of constraining development on lots along the road and that the lots facing Touisset Road might not have safe access because of the height of the grading on the new lots and existing stone walls. Id. at 8-9.
The Board of Review found these findings to be against the weight of the evidence. It noted that the lots conformed to all zoning requirements, as well as all set back and buffer zones such that all of the lots except the one reserved for open space were buildable. Id. at 3. The Board of Review also noted that the applicant's traffic engineer reported that the subdivision would not have an adverse effect on traffic safety.
The record does not evidence that a previously undocumented drainage line would render any lots unsuitable for development. Likewise, while a number of residents of the area complained that the nearby roads are busy, there was no probative evidence in the record to indicate that there would be an increase in traffic precluding further development or depriving any of the lots of adequate access to a public road.[15] It is well settled that lay judgments on the issue of the effect of a proposed use on neighborhood traffic conditions lack probative force.Toohey v. Kilday, 415 A.2d 732, 737 (R.I. 1980). The Court concludes that the Board of Review findings were supported by the reliable, probative and substantial evidence in the record.
In addition to these factors, the Planning Board was also required to address the general purposes of land development and subdivision ordinances as set out in § 45-23-30. See § 45-23-60(a). The Planning Board found that the proposed development was not of high quality and appropriate design, especially with regard to the septic system. Planning Bd. Dec. at 9. In addition, the Planning Board found that the subdivision would threaten the existing natural environment, would be poorly integrated with the surrounding neighborhood, and would not reflect the intent of the town's comprehensive plan. Id. at 10. Finally, the Planning Board found that the applicant's attempts to mitigate the potential impact — including deed restrictions on watering and planting drought resistant grass — would not be ineffective, ignored, and unenforceable.Id.
In examining the Planning Board's conclusions, the Board of Review noted that the Planning Board erroneously faulted the applicant for failing to prove that the subdivision was "needed" and for failing to "guarantee" that there would never be any type of problem. Zoning Bd. Dec. at 12 (quoting Planning Bd. Dec. at 3). In addition, the Board of Review found that the Planning Board impermissibly attempted to implement "legislative-type judgments that are in conflict with the evidence in the record and with the actual physical and legal constraints applicable to the property." Id. The Planning Board did not, concluded the Board of Review, deny the application based on the weight of the evidence or through proper application and analysis of the Comprehensive Plan. Id.
The record reflects that the Planning Board's decision was, as a whole, clearly erroneous as it exceeded its authority by attempting to, in effect, rewrite the zoning ordinance.
 CONCLUSION
After reviewing the entire record, this Court finds that the decision of the Board of Review was supported by reliable, probative and substantial record evidence. The decision was not made in excess of the Board of Review's authority under § 45-23-71(a) or affected by error of law. Accordingly, the decision of the Board of Appeal is affirmed. Counsel shall submit an appropriate order for entry, consistent with this decision.
[1] The proposal has since been reduced to eighteen residences.
[2] Geremia reviewed a site plan, documents from the CRMC and DEM, the Master Plan decision, and correspondence from the applicant's engineer, DiPrete Engineering to the Town's administrative officer.
[3] Heald lives within 200 feet of the subdivision, and so was in the area notified of the proposed development. (Tr. 1/29/01 at 124.)
[4] In addition, Heald testified that she "only had five minutes to look at" the traffic study. Id. at 117.
[5] These are DEM Best Management Practices guidelines. (Tr. 1/29/01 at 128.)
[6] GRF has agreed to include deed restrictions on regarding the subdivision lots.
[7] These recommendations have since been embodied in proposed deed restrictions on the subdivision. Landry testified before the Planning Board regarding proposed deed restrictions that would assure the board and the objectors that future homeowners would not upset the delicate balance being created by the subdivision approval process. These restrictive covenants would require homeowners to comply with DEM guidelines for the design and use of sand filters in critical resource areas, to comply with specific lawn care and landscaping provisions, prohibit owners from changing the grade of the lots, make the Homeowners' Association responsible for maintaining drainage swales, basins, and piping on private property, and require it to indemnify the Town on any claim resulting from a malfunction of a septic system. (11/20/00 at 69.) The restrictions would require certain areas to remain open space, prevent the removal of an existing barn, id. at 69-70 and perhaps most significantly, would be enforceable not just by members of the homeowners' association, but by neighboring owners and the Town. (Tr. 1/29/01 at 99.)
[8] A member of the Planning Board noted that no building permit is issued until the builder shows that there is sufficient potable water for household needs available from the well. (Tr. 1/29/01 at 56.)
[9] Although the Board of Review stated that it did not reverse the Planning Board's decision due to clear error, the Board of Review's findings that the Planning Board wholly exceeded its authority by attempting to engage in rezoning the property by quasi-judicial fiat, amounted to an implicit finding of clear error. See In re Touisset Farms
at 12 (Town of Warren Zoning Board of Review sitting as the Subdivision Board of Review) [hereinafter Zoning Bd. Dec.].
[10] The Court notes that some of the policies of the Comprehensive Plan, cited by the Planning Board, require the Town Council to develop regulations furthering these policies; they do not authorize the Planning Board, which is a quasi-judicial body — to decide applications based thereon.
[11] The Court notes that the zoning of this property had at one point been changed to R-80, requiring lower density development, but this change had been allowed to sunset, and the property reverted to R-40.
[12] Since the effective date of the Zoning Enabling Act, all local zoning ordinances adopted or amended and all land use decisions have been required to be "in conformance" or "consistent" with municipality's comprehensive plan. See §§ 45-22.2-13, 45-24-39(b)(2), 45-24-34.
[13] In Restivo, the plaintiffs had appealed a board of review's reversal of a planning board's decision on a subdivision application.Restivo, 707 A.2d at 664. The posture of these two cases is thus similar. It is therefore noteworthy that our Supreme Court upheld the decision of a justice of this Court upholding the board of review's reversal under the "any competent evidence" standard. Id. at 669. It did not directly apply the "any competent evidence standard" to the planning board's decision as the plaintiffs urge this Court to do.
[14] Note that the definition of "physical restraint to development" is not synonymous with the Planning Board's "unsuitable for development: "Physical constraints to development. Characteristics of a site or area, either natural or man-made, which present significant difficulties to construction of the uses permitted on that site, or would require extraordinary construction methods. See also environmental constraints." Section 45-23-32(31) (emphasis in original).
[15] The Court notes that there was lay testimony to the effect that the road onto which the subdivision would exit was unsafe due to speeding motorists and the like; however, this condition does not render access inadequate, especially in light of the fact that the only competent evidence in the record indicates that the subdivision would have a negligible, if any, effect on traffic. Moreover, lay testimony on the effect of a proposed use has no probative force. Salve Regina College,594 A.2d at 882 (citing Toohey, 415 A.2d at 737).